UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                :

SHERRY SCALERCIO-ISENBERG,         :
                                :
                 Plaintiff,    :
                                :
       - against -         :
                                :
                                :
PORT AUTHORITY OF NEW YORK AND  :
NEW JERSEY,                    :
                                :
                 Defendant.  :
--------------------------------------------------------X

16-CV-8494 (VSB)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/17/2020__

Appearances:

Sherry Scalercio-Isenberg
Sparta, New Jersey
*Plaintiff Pro Se*

Christopher J. Neumann
Port Authority Law Department
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Sherry Scalercio-Isenberg ("Plaintiff") brings this action against Defendant the

Port Authority of New York and New Jersey ("Defendant" or the "Port Authority"), alleging

disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  Before me is Port

Authority's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Although I find that there is a genuine factual dispute as to whether Port Authority provided

Plaintiff with a reasonable accommodation, Port Authority has demonstrated that Plaintiff's

requested accommodations would "fundamentally alter the nature of the service[s] provided, or

impose an undue financial or administrative burden" on Port Authority, *Disabled in Action v. Bd.*

*of Elections of New York*, 752 F.3d 189, 197 (2d Cir. 2014), such that such accommodations cannot be viewed as reasonable under the circumstances.  Accordingly, Port Authority's motion for summary judgment is GRANTED.

## I.    Factual Background[1]

The Port Authority is a state agency that was created by compact between the States of New York and New Jersey in 1921, with consent of the Congress of the United States.  (Def. 56.1 ¶ 1.)[2]  Port Authority's statutory mission is to develop terminal, transportation, and other facilities of commerce within the Port of New York District, a statutorily-defined geographic area embracing New Yok Harbor, including parts of New York and New Jersey.  *See* N. J. Stat. Ann. § 32:1-3 (West 1990); N.Y. Law § 6403 (McKinney 2019); (Def. 56.1 ⁋ 2.)  Port Authority operates all the interstate vehicular tunnels and bridges in the Port District, which together with the Port Authority Bus Terminal, PATH, and the Trans-Hudson Ferry Service, constitute the Port Authority's interstate transportation network.  (*Id.* ¶ 3.)

The Port Authority Bus Terminal ("PABT")—completed in December of 1950—is the world's busiest bus commuter hub by traffic volume serving approximately 260,000 passengers on a typical weekday out of 186 active bus gates.  (*Id.* ¶¶ 4-5; Studio 5 Report, at 10-11.)[3]  There

---

[1] I make these factual findings in light of the parties' Local Rule 56.1 statements and the declarations and exhibits submitted in connection with summary judgment.  At times, I cite to allegations in Plaintiff's Complaint and Amended Complaint.  My reliance on these allegations is for purposes of presenting a coherent factual background, but is not intended to be a finding of undisputed facts.  Plaintiff has been warned of the risks of failing to comply with Local Civil Rule 56.1 and Federal Rule if Civil Procedure 56, (*see* Docs. 128, 143), and "[a] *pro se* plaintiff . . . cannot defeat a motion for summary judgment by simply relying on the allegations of h[er] complaint; [s]he must present admissible evidence from which a reasonable jury could find in h[er] favor."  *Belpasso v. Port Auth. of New York & New Jersey*, 400 F. App'x 600, 601 (2d Cir. 2010) (summary order) (citing *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir.1996)).  Although Plaintiff at times cites to record evidence in her Local Civil Rule 56.1 statement, Plaintiff has not filed an opposition memorandum and has largely failed to meet her summary judgment obligations.

[2] "Def. 56.1" refers to Port Authority's Local Civil Rule 56.1 statement.  (Doc. 140.)

[3] "Studio 5 Report" refers to the Expert Witness Report Prepared By Studio 5 Partnership Architects/Planners, LLC, attached to the Declaration of Christopher J. Neumann as Exhibit M.  (Doc. 141-13.)

are two types of gates in the PABT:  "saw tooth" and "pull through" gates.  The saw tooth gates

are fully ADA Compliant and allow buses to pull in to platforms on a diagonal in order to board

and discharge passengers.  (*Id.* ¶ 15.)  In order to depart from a "saw tooth" gate, a bus driver

must backup into the active roadway and then drive forward into the active roadway.  (*Id.*)  On

the fourth floor of the PABT, there are 21 saw tooth gates enumerated as Gates 401 through 421.

(*Id.*; Studio 5 Report, at 16.)  The "pull through" gates are accessible by stairs and escalator, but

not by elevator, and allow bus drivers to pull up to the gate, discharge or pick up passengers, and

then drive directly back on to the active roadway.  (Def. 56.1 ¶ 15.)  On the fourth floor of the

PABT, there are 8 pull through gate platforms enumerated as platforms 206, 207, 208, 220, 221,

222, 223, and 228.  (*Id.*; Studio 5 Report, at 16.)

Since the PABT's physical and operational constraints prohibited full ADA access to the

pull through gates[4], an alternative operational remedy was devised and employed:  exclusive

access to ADA accessible Gate 421.  (*Id.* ¶ 30.)  Gate 421 is located on the fourth floor, Ninth

Avenue Side of the PABT, on the main bus lane, and is not assigned to any individual bus

carrier, but is exclusively designated as the ADA gate for use by all bus companies assigned to

the fourth floor pull through gates.  (*Id.* ¶¶ 31-32.)  Gate 421 allows for a bus driver to pick up a

disabled passenger and then to safely proceed to the bus-assigned pull through gate to pick up

remaining passengers, and is also utilized when a bus is dropping off a disabled passenger.  (*Id.*

¶¶ 36-37.)  Gate 421 features an ADA compliant ramp with handrails and an automatic sliding

---

[4] Plaintiff does not attempt to dispute this factual assertion, and I therefore deem it admitted.  Having reviewed the record independently, however, I am convinced that the record evidence submitted by Port Authority confirms that physical and operational constraints at the PABT render ADA access to the pull through gates "technically infeasible."  (*See* Studio 5 Report, at 10-11.)  For example, the Studio 5 Report cites a Pull-through Gate Report issued March 21, 2005 documenting the structural and operational difficulties associated with trying to build accessible pull through gates, including the need to remove and alter many essential load-bearing structures within the PABT in order to construct elevators, space constraints that would jeopardize the ability to construct elevators while maintaining required queue space, and the need for major structural modifications that would ultimately result in lost gate positions and the ability to service daily commuters.  (*Id.*)

door to the platform, and leads directly to an accessible bathroom and elevator.  (*Id.* ¶ 33.)  Next to the automatic door is a telephone and an intercom that connects directly to NJ Transit Customer Service, which also serves as a liaison for bus company lines, including the Rockland, Coach, and Lakeland bus lines that utilize the fourth floor.  (*Id.* ¶ 34.)  At Gate 421, there are also security cameras that are monitored.  (*Id.* ¶ 35.)[5]

On September 8, 2015, Port Authority underwent a major reorganization of the bus gates in order to "[i]ncrease bus gate efficiencies, enhance []safety and decrease traffic and pollution." (*See* Studio 5 Report, at 4.)  The 2015 reorganization and reallocation of bus gates was the culmination of research that began in 2012 with the "Quality of Commute Gate Reallocation Study."[6]  As part of this reorganization, the PABT moved the Lakeland bus line, which had relatively fewer departures, from saw tooth gates 402/403—accessible by elevator—to pull through gates 206/207.  (Def. 56.1 ¶¶ 17-18; Compl. 5.)[7]  As pull through gates, Gates 206/207 are accessible in only two ways:  (1) by taking an escalator and multiple flights of stairs, or (2) by taking the elevator to gate 403 and walking across active bus lanes.  (Def. 56.1 ¶ 15.)  After the reallocation of gates, the "number of trips leaving from the fourth floor saw-tooth gates went from 189 trips up to over 230 trips," and the reallocation "ease[d] congestion because it reduced

_____

[5] Plaintiff disputes these factual assertions and claims that Gate 421 is dangerous, (Pl. 56.1, at 38); however, her contrary factual assertions are not supported by the record evidence.  For example, she claims that Ronal Shindel, Commanding Officer of the Port Authority Police Department, testified that he did not know whether the gate cameras were monitored.  (*See* Deposition of Ronal Shindel, (Doc. 133-2), 19:10-16.)  I note that Port Authority's record evidence states that the Gate 421 cameras are monitored, and Plaintiff does not cite evidence to the contrary. (*See* Declaration of Christopher J. Neumann, (Doc. 141 ("Neumann Decl.")), Ex. M, bates PA00690-PA00691.) Also, the deposition testimony Plaintiff cites of Officer Shindel actually states that he was not "aware of any reports or complaints of potential crime in the Gate 421 area."  (Deposition of Ronal Shindel, (Doc. 133-2), 28:2-7; 29:24-30:12.)

[6] Documents concerning this study are available at Exhibit M, Appendix D to the Neumann Declaration.  (Doc. 14-17.)

[7] "Compl." refers to Plaintiff's Complaint, filed on November 1, 2016.  (Doc. 1.)  Because the Complaint is not consecutively paginated, the page numbers cited correspond to the page numbers assigned by the ECF system.

the number of times incoming bus flow needed to be paused to allow the buses [to] back[] up out of the accessible Gate 421." (Studio 5 Report, at 20-21.)

Plaintiff is a commuter who utilizes the Lakeland bus line at Port Authority to travel to and from Sparta, New Jersey on a regular basis. (Am. Compl. 8.)[8] Plaintiff has a disability on the left side of her body, which prevents her from using an escalator or climbing stairs. (Compl. 5.) As a result, because the Lakeland bus now departs from gates 206/207, to access these gates Plaintiff has attempted to cross active bus lanes as buses are entering and exiting the gates rather than utilizing Gate 421. (*Id.*; Def. 56.1 ¶ 46) There are signs posted in the bus lanes stating "DO NOT ENTER/DANGER ACTIVE BUS LANES," (Compl. 9), and pursuant to Port Authority regulations, patrons of the Port Authority Bus Terminal are prohibited from entering the active lanes of bus traffic, (Def. 56.1 ¶ 49). Plaintiff alleges that she has missed her bus on several occasions out of fear of walking across the bus lanes, forcing her to take a later bus or a car service.

On August 8, 2016, the Plaintiff sent an email to the Port Authority Web Feedback email address with the heading "Disability Discrimination" indicating that she had "filed a complaint at ADA.gov and cont[]acted Governor Christie and [] emailed Channel 12 news." (Def. 56.1 ¶ 39.) On August 8, 2016, Brian Jacob, Manager of Customer Programs and Services for Port Authority, spoke with the Plaintiff to determine the nature of her complaint, and the next day left her a voicemail. (*Id.* ¶¶ 40-41.) On August 9, 2016, Jacob also sent Plaintiff an email outlining use of Gate 421 by disabled passengers. Jacob's email to the Plaintiff states:

Dear Ms. Isenberg:

I just left a voicemail for you and wanted to follow up on our telephone

---

[8] "Am. Compl." refers to Plaintiff's Amended Complaint, filed on February 2, 2018. (Doc. 84.) Because the Amended Complaint is not consecutively paginated, the page numbers cited correspond to the page numbers assigned by the Electronic Court Filing ("ECF") system.

conversation from yesterday.  I spoke with Port Authority Bus Terminal staff this morning, who confirmed that bus companies can make arrangements for disabled passengers to board vehicles at one of the terminal's ADA-compliant gates.  You can pre-arrange your travel times directly with Lakeland, who can then pick you up at Gate 421 before picking up passengers at its regular Gates 206/207.  If you were to miss your bus for some reason, you can always speak with a platform supervisor or use any of the house phones to contact the control center and arrange for the n[ext] available bus.

Lakeland can be reached at 973-366-0600.  You'll need to speak with them directly regarding their specific check-in policy (*i.e.*, you may need to call 1 hour beforehand to confirm [ex]pected pickup times).

I hope that this information proves helpful and that your future travels in the New York-New Jersey region are safe, reliable and trouble-free.

Sincerely,

Brian Jacob

(*Id.* ¶ 42.)  Plaintiff responded to Jacob's email as follows:

Going to Gate 421 is UNACCEPTABLE, that is the same as going Standby on a flight @ the airport!  I waited almost 2 hours for a bus, then once on a bus came, it was the wrong Bus.  They had me change buses AND again I had to walk across active Bus lanes.  Do You like going standby on flights AND THEN WALKING ACCROSS THE TARMAC with jet engines running!!!  I'm always willing to pay more [$$$$] to book a First-class seat that is confirmed, more leg room & edible food !![]  Take your own advice and try my commute to/ from Wallstreet for a week AND then let's talk, but you are wasting time and putting me in danger of being injured by a bus or maneuvering in ACTIVE bus lanes.  This is Disability Discrimination at its BEST.  I've alerted channel News 12.

(Pl. 56.1, at 42-44.)

On June 28, 2017, Plaintiff informed Port Authority that rather than utilizing the ADA compliant gate, to access her Lakeland Bus she intended to continue to cross active lanes of bus traffic in order to get to Lakeland's assigned gates.  (*Id.* ¶ 46.)  On June 30, 2017, Port Authority sent Plaintiff a letter stating that under no circumstances should Plaintiff be crossing active lanes of bus traffic, and informing her again on the procedures to utilize Gate 421.  (*Id.*)  The letter further stated the following:

> The Port Authority and your bus carrier (Lakeland) continue to provide a safe, effective way for you to board your bus. Simply call your carrier an hour prior to your intended departure time to inform them of the departure time of the bus that you intend to catch, and arrive at Gate 421 a half hour to twenty minutes prior to the bus' scheduled departure time so that you can be picked up. You should, however, speak to Lakeland directly regarding this specific check in policy.

(*Id.* ¶ 47.)

Instead of following Gate 421 procedures, Plaintiff requested that Lakeland Bus be moved back to a saw tooth gate or that she be permitted to cross active lanes of bus traffic to reach the Lakeland Gates at 206/207. (*Id.* ¶ 48.) Plaintiff maintains, without record support, that utilizing Gate 421 is unreasonable because the gate is "for wheelchair access and requires making a reservation at least [two] hours in advance of the time a person thinks they will arrive at the Bus terminal, plus they must call when they arrive at the terminal, then call again at gate 421 if a bus is not at the Gate. Then a person must wait approximately 30-60 minutes for a bus to come to gate 421." (Pl. 56.1, at 49.)[9] Plaintiff further maintains, again without record support, that Gate 421 "is a very dangerous area of the terminal," and "is isolated down a dark corridor with no security, where homeless people & panhandlers congregate to be inside [and] off the street," making it "a very unsafe place for a woman, especially by herself at night[.]" (*Id.* at 52-53.) Plaintiff testified at her deposition that she would aim to take either the 4:30 p.m.,

---

[9] Plaintiff does not cite to competent summary judgment evidence in making these assertions, and due to her lack of personal knowledge I do not credit Plaintiff's representations that using Gate 421 requires a patron to make a reservation at least two hours in advance of the patron's arrival, or that a patron must wait thirty to sixty minutes for their bus after arriving at Gate 421. Indeed, there is evidence in the record demonstrating that Gate 421 reservations need not be made so far in advance, and that wait times are significantly shorter than Plaintiff represents. I do not rely on this evidence cited by Defendant, (*see* Studio 5 Report, at 24 ("On May 30 at 4:11 P.M., I saw and interviewed a disabled passenger who uses a walker at Gate 421. She calls her bus company from her personal cell phone around 30 minutes before her arrival each day and waits an average of 5 to 7 minutes for her bus to pick her up."), in the instant Opinion & Order, because that evidence is based on hearsay and inadmissible to support a summary judgment motion. *See Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment" and district courts need only consider admissible evidence in ruling on a motion for summary judgment).

5:20 p.m., or 6:45 p.m. bus.  (Scalercio-Isenberg Dep., 98:12-14.)[10]  Additionally, Plaintiff

admitted at her deposition that she has only attempted to utilize Gate 421 twice.  (*Id.* 158:3-

159:20.)  During her two attempts to utilize Gate 421, however, Plaintiff did not follow the

proper procedures for utilizing the gate by pre-arranging her bus pick-up, and did not call

Lakeland until she was present at the gate waiting for her bus.  (*Id.* 163:15-19.)

## II.    <u>Procedural History</u>[11]

On February 2, 2018, Plaintiff filed the Amended Complaint adding Port Authority as a

defendant in this case.  (Doc. 84.)  On March 31, 2018, I entered an Opinion & Order denying

Port Authority's motion for judgment on the pleadings, but granting co-defendant Foye's motion,

(Doc. 99).  *See Scalercio-Isenberg v. Port Auth. of New York*, No. 16-CV-8494 (VSB), 2018 WL

1633767 (S.D.N.Y. Mar. 31, 2018).  On April 13, 2018, I referred this case to Magistrate Judge

Sarah Netburn for general pre-trial.  (Doc. 102.)  Port Authority filed an Answer to the Amended

Complaint on April 23, 2018, (Doc. 106), and a briefing schedule for summary judgment was

entered on April 26, 2018, (Doc. 107).  On September 11, 2018, Plaintiff filed an affidavit, (Doc.

117), and on September 14, 2018, Port Authority filed a motion for summary judgment

supported by a memorandum of law and a Local Civil Rule 56.1 statement, (Docs. 118-22).  On

September 16, 2018, Plaintiff filed an affidavit in opposition to Port Authority's motion, (Doc.

123), and on October 12, 2018, Port Authority filed a reply, (Doc. 124).  On September 6, 2019,

I entered an Order denying Port Authority's motion for summary judgment without prejudice to

refile, as the motion relied on unsworn expert reports, and directed Plaintiff to make sure that any

---

[10] "Scalercio-Isenberg Dep." refers to the Deposition of Sherry Scalercio-Isenberg, dated June 26, 2017, (Doc. 141-5).

[11] A summary of the pre-motion for summary judgment procedural history in this case can be found in my March 31, 2018 Opinion & Order, (Doc. 99).  *See Scalercio-Isenberg v. Port Auth. of New York*, No. 16-CV-8494 (VSB), 2018 WL 1633767 (S.D.N.Y. Mar. 31, 2018).

future filings in opposition to Port Authority's motion complied with the requirements of Rule 56 and Local Civil Rule 56.1.  (Doc. 128.)

On October 15, 2019, Port Authority filed its renewed motion for summary judgment, supported by a memorandum of law, a declaration, Local Civil Rule 56.1 statement, and the requisite notice to pro se litigant.  (Docs. 139-143.)  On November 22, 2019, Plaintiff filed an opposition to Port Authority's motion for summary judgment, styled as a Local Civil Rule 56.1 statement.  (Doc. 147.)  In addition, Plaintiff filed various other exhibits on the docket in support of her claims.  (*See* Docs. 131, 133, 134, 135, 136, 137, 138, 144, 145, 146.)  Briefing on the summary judgment motion was completed when Port Authority filed its reply memorandum on December 12, 2019.  (Doc. 148.)

### III.    Legal Standards

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v.*

*Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may," among other things,

"consider the fact undisputed for purposes of the motion" or "grant summary judgment if the

motion and supporting materials—including the facts considered undisputed—show that the

movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the

evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in its favor, and may grant summary judgment only when no reasonable trier of fact could find in

favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and

internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any

evidence in the record that could reasonably support a jury's verdict for the non-moving party,"

summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286

(2d Cir. 2002).

Pro se litigants are afforded "special solicitude" on motions for summary judgment.

*Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).  Courts read the pleadings, briefs, and

opposition papers of pro se litigants "liberally and interpret them 'to raise the strongest

arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)

(quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)); *see also Hughes v. Rowe*, 449

U.S. 5, 9 (1980) (stating that the submissions of pro se litigants are "held 'to less stringent

standards than formal pleadings drafted by lawyers'" (quoting *Haines v. Kerner*, 404 U.S. 519,

520 (1972))).

However, "pro se status does not exempt a party from compliance with relevant rules of

procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477

(2d Cir. 2006) (internal quotation marks omitted); *see also Jorgensen v. Epic/Sony Records*, 351

F.3d 46, 50 (2d Cir. 2003) (stating that the obligation to read pro se pleadings liberally "does not

relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary

judgment" (citation omitted)); *Bennett v. James*, 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010)

("Notwithstanding the deference to which a *pro se* litigant is entitled, as well as the deference

accorded to a non-movant on a summary judgment motion, [the non-movant] must produce

specific facts to rebut the movant's showing and to establish that there are material issues of fact

requiring a trial." (citations and internal quotation marks omitted)).  "[A] pro se party's 'bald

assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for

summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v.*

*Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   <u>Discussion</u>

In its motion, Port Authority "asserts that Plaintiff[']s[] claims fail because it has

provided the Plaintiff with a reasonable accommodation," and second, "to the extent the Plaintiff

has requested a reasonable accommodation she has not presented a plausible method of making

the [Port Authority Bus Terminal] readily accessible."  (Doc. 142, at 17 (internal quotation

marks omitted).)

### A.    *Applicable Law*

Title II of the ADA states that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise

qualified individual with a disability . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  Courts

are required to construe both the ADA and Rehabilitation Act—as remedial legislation—broadly

to effectuate their remedial purpose.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir.

2003).  "Because the standards adopted by the two statutes are nearly identical, [courts] consider

the merits of these claims together."  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir.

2016) (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)).[12]

To establish a prima facie violation under both statutes, a plaintiff must show the

following:

> (1) plaintiff is a "qualified individual with a disability;" (2) plaintiff was "excluded
> from participation in a public entity's services, programs or activities or was
> otherwise discriminated against by [the] public entity;" and (3) "such exclusion or
> discrimination was due to [plaintiff's] disability."

*Mount Vernon Sch. Dist.*, 837 F.3d at 158 (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir.

2009) (quoting *Hargrave v. Vt.*, 340 F.3d 27, 34–35 (2d Cir. 2003))).  Exclusion or

discrimination can be demonstrated by showing that Plaintiff was denied "reasonable

---

[12] Claims under the Rehabilitation Act require a showing that the defendant receives federal funding.  29 U.S.C.
§ 794(a).  Port Authority does not dispute that it receives federal funding, so I consider Port Authority to have
conceded that issue for purposes of this motion.

accommodations to enable meaningful access to services, programs, and activities." *Bernstein v. City of New York*, 621 F. App'x 56, 59 (2d Cir. 2015) (summary order) (internal quotation marks omitted); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015) (A plaintiff can demonstrate exclusion or discrimination when a defendant fails to provide "reasonable accommodations that permit [the plaintiff] to have access to and take meaningful part in public accommodations," (internal quotation marks omitted)); *see also Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) ("In examining this claim, we ask whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" (quoting *Henrietta D.*, 331 F.3d at 273)).  A plaintiff need not demonstrate that she is entirely precluded from accessing a benefit; rather, difficulty in accessing a benefit is sufficient to sustain a reasonable accommodation claim.  *See Wright*, 831 F.3d at 73 (stating that an accommodation is not reasonable if it "deters the plaintiff from attempting to access the services otherwise available to him"); *Disabled in Action*, 752 F.3d at 200 (recognizing that "deterrence constitutes an injury under the ADA" (quoting *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013))); *Henrietta D.*, 331 F.3d at 277 ("[T]he demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation.").

"Individuals may be deprived of meaningful access to public programs due to architectural barriers or a public entity's failure to modify existing facilities and practices." *Disabled in Action*, 752 F.3d at 197.  However, the laws do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a)(1).  Similarly, "[a] public entity is not required to make

structural changes in existing facilities where other methods are effective in achieving compliance" with its obligations.  28 C.F.R. § 35.150(b)(1).  Instead, "[a] public entity may comply with the [relevant] requirements . . . through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, . . . alteration of existing facilities, . . . or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(b)(1); *see also Disabled in Action*, 752 F.3d at 197 ("[A] public entity does not need to employ any and all means to make services accessible," rather, "public entities shall operate each service, program, or activity, so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities" (internal quotation marks and citations omitted)).  However, when a public entity attempts to provide an accommodation for disabled individuals, "the accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities."  *Wright*, 831 F.3d at 72.

"A plaintiff alleging that [s]he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation . . . ."  *McElwee*, 700 F.3d at 642.  However, a public entity need not "provide a disabled individual with every accommodation [s]he requests or the accommodation of h[er] choice."  *McElwee*, 700 F.3d at 641.  "Instead, the [ADA and Section 504 of the Rehabilitation Act] require only reasonable modifications that would not fundamentally alter the nature of the service provided, or impose an undue financial or administrative burden."  *Disabled in Action*, 752 F.3d at 197.  With respect to public transportation services in particular, 49 C.F.R. § 37.169 states the following:

(c) Requests for modification of a public entity's policies and practices may be denied only on one or more of the following grounds:

> (1) Granting the request would fundamentally alter the nature of the entity's services, programs, or activities;
>
> (2) Granting the request would create a direct threat to the health or safety of others;
>
> (3) Without the requested modification, the individual with a disability is able to fully use the entity's services, programs, or activities for their intended purpose.
>
> . . .
>
> (e) In any case in which a public entity denies a request for a reasonable modification, the entity shall take, to the maximum extent possible, any other actions (that would not result in a direct threat or fundamental alteration) to ensure that the individual with a disability receives the services or benefit provided by the entity.

*Id.*[13] "The hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015). "Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder," and "[a] defendant is 'entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation.'" *Wright*, 831 F.3d at 72–73 (quoting *Dean*, 804 F.3d at 189 (internal quotation marks omitted)).

## B.   *Application*

### 1.   **Port Authority's Proposed Accommodation**

Plaintiff argues that the "access [she] was provided to board a Lakeland bus at [] Gate 421[] does not qualify as equivalent access under the ADA." (Pl. 56.1, at 8.) The basis for Plaintiff's argument is the burden imposed by the call-ahead system utilized at Gate 421, and the

---

[13] The implementing regulations also state—with respect to public transportation—that "[w]henever feasible, requests for modifications shall be made and determined in advance, before the transportation provider is expected to provide the modified service, for example, . . . through customer service inquiries . . . ." 49 C.F.R. § 37.169(b)(3). And "[w]here a request for modification cannot practicably be made and determined in advance . . . , operating personnel of the entity shall make a determination of whether the modification should be provided at the time of the request." *Id.* § 37.169(b)(4).

additional temporal burden imposed on patrons boarding at Gate 421.[14]

I begin with the nature of the accommodation Port Authority has offered Plaintiff:  access to an ADA-compliant gate where Plaintiff can call ahead for bus boarding.  The nature of this accommodation is permissible under governing law, since Port Authority is not required to "make each of its existing facilities accessible to and usable by [Plaintiff]," 28 C.F.R. § 35.150(a)(1), by, for example, "mak[ing] structural changes" to its pull through gates if "other methods are effective in achieving compliance" with its obligations, 28 C.F.R. § 35.150(b)(1).  Here, Port Authority can comply with its ADA obligations through "reassignment of services to accessible buildings," like Gate 421, "or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(b)(1).

Plaintiff argues, however, that Gate 421's call-ahead-and-wait requirement imposes a barrier to accessing PABT's services, rendering Port Authority's accommodation unreasonable.  I agree with Plaintiff that a genuine issue of material fact exists as to whether the Gate 421 procedure is a reasonable accommodation.  Second Circuit law makes clear that to be considered reasonable, Port Authority's "accommodation must overcome . . . non-trivial temporal delays that limit access to" Port Authority's services, but Port Authority's proposed accommodation does not overcome such delays.  *Wright*, 831 F.3d at 72.  In *Wright*, the Second Circuit concluded that a department of correction's mobility assistance program was ineffective, and thus failed to provide a reasonable accommodation, when an inmate was forced to request a mobility aide "well in advance" of the time at which he sought to move about the facility.  *Id.* at

---

[14] I do not consider Plaintiff's argument that Gate 421 is dangerous area of the PABT, because Plaintiff has not cited competent summary judgment evidence to support this assertion.

74.  The court rendered this conclusion after reasoning that "[a] mobility-impaired inmate that must book a mobility aide 'well in advance' will be unlikely, for example, to obtain assistance when a sudden need to use the restroom arises and will probably avoid the prison yard, lest he or she be unable to escape a prison fight quickly."  *Id.*  Similarly, in *Celeste v. East Meadow Union Free School District*, the Second Circuit concluded that "minor architectural barriers" at a school that forced a student "to take a ten minute detour each way in order to reach and return from the athletic fields," deprived the student of meaningful participation in athletics because it amounted to "an unnecessary usurpation of [the student's] time."  *Celeste*, 373 F. App'x at 88 (2d Cir. 2010).  In addition, with respect to transportation services, the Fourth Circuit recently noted that "for accommodations in [] bus travel, the [ADA] regulations emphasize that 'advance notice requirements are generally undesirable' and should be used only when necessary to ensure the accommodation can be made, such as when extra staffing is needed."  *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 675 (4th Cir. 2019) (quoting 49 C.F.R. pt. 37, app. D, § 37.169).  However, the undisputed facts, and indeed Port Authority's own representations, indicate that Plaintiff would be forced to expend significant time should she follow Gate 421's call-ahead-and-wait procedure.  For example, when Port Authority initially communicated its accommodation to Plaintiff, it instructed Plaintiff to "pre-arrange [her] travel times directly with Lakeland, who [would] then pick [her] up at Gate 421 before picking up passengers at its regular Gates 206/207."  (Def. 56.1 ¶ 42.)  The instructions further stated that Plaintiff would "need to speak with [Lakeland] directly regarding their specific check-in policy," and that Plaintiff might "need to call 1 hour beforehand to confirm [ex]pected pickup times."  (*Id.*)  In its follow up correspondence with Plaintiff, Port Authority asked Plaintiff to "call [Lakeland] an hour prior to [her] intended departure time to inform them of the departure time of the bus that [she] intend[s]

to catch, and arrive at Gate 421 a half hour to twenty minutes prior to the bus' scheduled departure time so that [she] can be picked up." (*Id*. ¶ 47.)  However, as Plaintiff represented at her deposition, she cannot always predict in advance exactly which bus she will try to catch. (*See* Scalercio-Isenberg Dep. 162:4-163:14 ("I don't know I'm going to take the 5:20 bus. . . . I don't know what time I will take the bus. . . . I don't know, and I shouldn't have to know, that's the privilege of a bus and train in New York City, you take what you want when you want and you jump on it . . . .").)  After attempting to use Gate 421, Plaintiff decided she would risk crossing the active bus lane instead.  There is therefore a factual dispute as to whether Port Authority's Gate 421 procedure "deters the plaintiff from attempting to access the services otherwise available to h[er]," *Wright*, 831 F.3d at 73, or "makes it difficult for [] [P]laintiff to access benefits," *Henrietta D.*, 331 F.3d at 277.

In light of the above, at the summary judgment stage I cannot find that "the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation."  *Wright*, 831 F.3d at 72–73 (quoting *Dean*, 804 F.3d at 189 (internal quotation marks omitted)).  Instead, there is a genuine issue of material fact as to whether Port Authority's Gate 421 procedure is reasonable.

### 2.  Plaintiff's Proposed Alternative Accommodations

Plaintiff has made two accommodation requests:  first, that Port Authority move the Lakeland bus lines back to the ADA compliant saw tooth gates; and second, that she be permitted to cross the active lanes of bus traffic in order to reach her Lakeland Bus at Gates 206/207 instead of boarding at Gate 421.  I find that there is no genuine factual dispute as to whether Port Authority properly denied Plaintiff's proposed alternative accommodations, and thus find that Plaintiff has failed to meet her burden as to "the existence of some

accommodation" available to her.  *McElwee*, 700 F.3d at 642.

With respect to Plaintiff's request that Port Authority move the Lakeland bus lines back to the ADA compliant saw tooth gates, I find that Port Authority has provided sufficient record evidence for me to conclude that there is no genuine factual dispute that granting Plaintiff's request would "fundamentally alter the nature of the service[s] provided, or impose an undue financial or administrative burden" on Port Authority.  *Disabled in Action*, 752 F.3d at 197; *see also* 49 C.F.R. § 37.169(c)(1).  Port Authority's expert report, prepared by Studio 5, outlines in detail how the 2012 "Quality of Commute Gate Reallocation Study" and 2015 gate reallocations were the product of years of research aimed at "[i]ncreas[ing] bus gate efficiencies, enhance[ing] []safety and decreas[ing] traffic and pollution."  (*See* Studio 5 Report, at 4.)  As represented in the Studio 5 Report, "Plaintiffs request to move Lakeland Bus Lines back to a saw-tooth gate would undo many of the critical life-safety and pedestrian / vehicular congestion improvements that were realized with the Gate Change of 2015."  (Studio 5 Report, at 29-30.)  Plaintiff's case thus contrasts with cases in which Plaintiffs "offered plausible, simple remedies, which [we]re *de minimis* compared with the corresponding benefits . . . achieved."  *Celeste*, 373 F. App'x at 88. Plaintiff has not proffered her own expert and does not seriously challenge the findings in the Studio 5 Report.  In other words, Plaintiff has not demonstrated that there are issues of fact related to the Studio 5 Report.  Examining the record, I am forced to deem Port Authority's factual assertions on this score admitted and not in dispute, because Plaintiff has not offered any evidence to rebut Port Authority's expert report pursuant to Rule 56.  *Cf. Frogge v. Fox*, No. 1:17-CV-155, 2019 WL 3383642, at *6–7 (N.D. W. Va. Apr. 12, 2019), *report and recommendation adopted*, No. 1:17CV155, 2019 WL 2418749 (N.D. W. Va. June 10, 2019) (concluding that a plaintiff's request for a deviation in bus service "would require a significant

alteration to the nature of the service," because defendant presented expert findings regarding the risks of altering the service and plaintiff provided only conclusory assertions that a different bus could be utilized).

With respect to Plaintiff's second request, I must conclude from the record that permitting PABT patrons to cross active bus lanes to access the pull through gates would result in the "direct threat to the health or safety of others." 49 C.F.R. § 37.169(c)(1). Port Authority's expert concluded that granting this request "puts not only [Plaintiff] at risk, but it threatens the safety of an escort, as well as the bus drivers and bus passengers that may be hurt by a potential accident or even the bus stopping short or performing and evasive maneuver to avoid hitting the unauthorized persons on the roadway." (Studio 5 Report, at 29-30.) Again, Plaintiff has not met her obligations under Rule 56 to properly address these factual assertions, leaving no genuine factual dispute regarding Port Authority's denial of her request.

Accordingly, although I find that Port Authority's Gate 421 procedure does not amount to a reasonable accommodation under the ADA and Section 504, Plaintiff has failed to meet her burdens of production and persuasion as to the existence of alternative accommodations that Port Authority could feasibly implement.

### V.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the open motion at Document 139 and to close this case. The Clerk is also directed to mail a copy of this Opinion & Order to the pro se Plaintiff.

SO ORDERED.

Dated: September 17, 2020
    New York, New York

Vernon S. Broderick
United States District Judge